UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

CLEWISTON COMMONS, LLC,

       Plaintiff,

v.                                    Case No:  2:18-cv-339-JLB-NPM

CITY OF CLEWISTON, MALI
GARDNER, AL PERRY, TRAVIS
REESE, DEBBIE MCNEIL and
KATHY COMBASS,

       Defendants.

_____/

## ORDER

This matter is before the Court on Plaintiff's Motion for Summary Judgment (Doc. 227) and Defendants' Motion for Summary Judgment (Doc. 228).  Plaintiff and Defendants responded to one another's summary judgment motions.  (Docs. 229, 230).  Plaintiff and Defendants filed replies in support of their respective motions.  (Docs. 231, 232).  After careful review of the record, Plaintiff's motion is **DENIED** and Defendant's motion is **GRANTED in part and DENIED in part**.

## BACKGROUND

This case involves a zoning dispute over the designation of a mobile home park in Clewiston, Florida.  (Doc. 111 at ¶¶ 1–7).  Plaintiff sues the City of Clewiston (the "City"), the City Commissioner and later mayor, Mali Gardner (an elected official), and four City employees—Al Perry (the City Manager), Travis

Reese (the Community Development Director), Kathy Combass (the City Clerk),[1] and Debbie McNeil, the City's code enforcement officer. (Doc. 111 at ¶¶ 1–2; Doc. 228 at ¶ 1). Yasir Khan indicated that he is the "point of contact for the ownership group," which consists of himself, Mohammed Yasin Khan, and Floyd Salkey. (Doc. 228-2 at 7).

In 2006, Plaintiff purchased real property located at 810-381 East Sagamore Avenue, Clewiston, FL 33440 (the "Property"). (Doc. 227 at 2; Doc. 229 at 1; Doc. 228-2 at 15). The Property was zoned as RM-1, "Mobile Home and Recreational Vehicle Park District," which permitted mobile homes and recreational vehicles. (Doc. 228-3 at 70, 72; Doc. 227-5 at 155; Doc. 228-6 at 19).

In 2007, the Property was rezoned to a General Commercial District. (Doc. 227-21 at 2; Doc. 228-5 at 4, 10; Doc. 228-6 at 19; Doc. 228-7 at 4). Mobile homes and recreational vehicles are not specifically listed as a permitted use in a property zoned General Commercial District. (*See* Doc. 228-6 at 20–21). Plaintiff claims that it originally sought a special exception. But the City recommended rezoning the Property and represented that Plaintiff could continue the mobile home use. For example, Wendell Johnson, the City's previous City Manager, told Plaintiff's representative that the Property "could continue as nonconforming until such time that he effected the development request and redeveloped it as commercial." (Doc. 227-1 at 16, 64–65). And Tommy Perry, a former member of a team that

---

[1] The only claim against Kathy Combass, the Sunshine Law claim (Count VII) was previously dismissed by this Court.

engineered for the City, testified that "I think he started out asking for a special exception, and the City said you should rezone, and encouraged the rezoning." (Doc. 227-2 at 14, 42).  But at the hearing regarding the zoning change, which took place on January 22, 2007 (at which Plaintiff's representative was present), the City Attorney stated that "the Code specified what uses are permitted in the Commercial district and Special Exceptions could be allowed if certain conditions are met; otherwise, other uses would be prohibited." (Doc. 228-7 at 3).  Plaintiff acknowledges that its purported agreement with Mr. Johnson (wherein Plaintiff would be perpetually allowed a non-conforming use until it decided to develop commercial property) was never approved by the City Commission or presented at a hearing.  (Doc. 228-2 at 58–59; Doc. 228-3 at 34–35).

Plaintiff's plan to redevelop the Property changed when the real estate market crashed and Plaintiff determined that the redevelopment was no longer feasible.  (Doc. 227 at 4; Doc. 227-3 at 55; Doc. 228 at 4).  Thus, Plaintiff continued to use the Property as a mobile home park after the change of zoning designation. (Doc. 227 at 4; Doc. 229 at 2).

Plaintiff states that between 2015 and 2016, individual residents received Notices of Violations from the City for various code violations on their respective units.  (Doc. 227 at 5).  Defendants admit that the City sent notices of code violations to individual tenants of the Property in 2015 but there is no record evidence of any specific notices.  (Doc. 229 at 2).

In 2016, the City created the Community Improvement Division, which removed code enforcement from the police department.  (Doc. 227-6 at 36).  Debra McNeil testified that "when [they] first started doing Code Enforcement . . . it started to come to the forefront . . . that there was heavy blight, and there were areas that they wanted to begin it with Code Enforcement."  (*Id.* at 80–82).  Ms. McNeil was directed to focus on the "blighted areas," which included the Property.  (Doc. 228-9 at 81–84; Doc. 227-6 at 99).

In 2016 and 2017, the City received persistent complaints from Anthony Perez who, among other things, sent Ms. McNeil emails with photographs and complaints about various issues, many of which were about Clewiston Commons.  (Doc. 227-6 at 109–12, 181; Doc. 227-7 at 1, 5–36).  Ms. McNeil testified that she had spoken with Mali Gardner about the area where Clewiston Commons was located as well.  (Doc. 227-6 at 180).[2]  Ms. McNeil issued numerous citations at the Property, most of which were resolved or cancelled.  (Doc. 228 at 5; Doc. 228-19 at 1–6).  Mr. Khan testified that Plaintiff "spent tens of thousands of dollars" to "clean

---

[2] In an email to Ms. Gardner, Mr. Perez commented that even if RVs are allowed in an area zoned for mobile homes, "they can be made to remove the structure or not allowed the electrical connection when they go to rent the structure.  This will drive them out of business which should be the goal."  (Doc. 227-8 at 1).  Ms. Gardner responded that "they are working on those issues to place pressure but . . . it's been many years since any of the issues have been addressed" and that certain individuals were "both committed to cleaning up Clewiston by compliance and to have a working code enforcement process."  (*Id.*)  Mayor Gardner testified during her deposition that "recreational vehicles in . . . mobile home parks, they are disgusting.  They have additions on them, they have all kinds of things trying to make them a home, and they are not a home.  That is my opinion.  So there is harm . . . to a community."  (Doc. 227-10 at 74).

4

up" the code violations.  (Doc. 227-3 at 78).  More specifically, Mr. Khan testified

that Plaintiff has suffered "loss of income" and "loss of ability to raise [the] rents

because [it] can't move anybody out."  (*Id.* at 84).

In 2016, Plaintiff applied for a special exception to operate, repair, and

replace units within the Property.  (Doc. 227-3 at 53–54; Doc. 228-20 at 1).  Mr.

Khan testified that the City planned to allow Plaintiff to continue operating the

mobile home park but it would not allow Plaintiff to put in new mobile homes if one

fell into disrepair or someone moved.  (*Id.* at 54–55).  Mr. Charles Schoech, the

former City attorney, testified that the City's underlying reason for no longer

permitting replacement of units was that:

> There was a lot of discussion in the town regarding the
> appearance of the trailers and mobile homes in the part.
> And the typical discussion was that it was an eyesore.  And
> so the City began enforcing the codes more than they had
> in the past.  And there was a request by an attorney in
> town, which came through the mayor, to have stronger
> enforcement in this area because of the appearance.

(Doc. 227-11 at 23).  Mr. Schoech further testified that "Mr. Reese was instructed

not to issue any more permits for the replacement of mobile homes" and that it was

his "understanding that that request came through the city manager and was

specifically implemented by Mali Gardner."  (*Id.* at 68).

Plaintiff's request for a special exception was set for a public hearing in May,

tabled until July, and then tabled again.  (Doc. 227-5 at 141–44).  Before the August

meeting, Travis Reese prepared a report for the City Commission stating that "[t]he

use of a mobile home park is a legal non-conforming use.  The applicant wishes to

5

continue the use of a mobile home park in this area so as older trailers leave, they can be replaced.  The city cannot permit replacement of mobile homes in the commercial zoning district." (Doc. 228-5 at 10).  Mr. Reese did not make a recommendation, instead stating that "[s]taff leaves the decision to board discretion." (*Id.*)

On August 15, 2016, the City Commission held its monthly meeting. (Doc. 227-14 at 2).  Mr. Khan was not present.  (*See id.*)  He indicated that he believed that the hearing was set for September.  (Doc. 228-2 at 71).  At the hearing, it was noted that "[t]he City cannot permit replacement of mobile homes with the commercial zoning in place" and Mali Gardner noted that "at the Planning and Zoning Board Meeting May 2, 2016, the recommendation was this special exception be denied." (Doc. 227-14 at 3).  A notice addressed to Zahra Khan indicated that "[a]t their regular meeting on August 15, 2016, the City Commission considered your application and denied your request for a special exception." (Doc. 228-30 at 1).

Mr. Khan admits that he knew in August 2016 that Plaintiff's special exception request was denied.  (Doc. 228-2 at 72).  He "felt like [Plaintiff was] just being railroaded at the time" and had a "feeling [Plaintiff was] being pushed through a process." (*Id.* at 72–73).  When asked whether he felt that it was not worth his time to appeal, Mr. Khan stated that Plaintiff was "the little guy" and that it was a "fox guarding the henhouse situation." (*Id.* at 73).  Plaintiff did not

6

request a reconsideration or file an appeal to Florida courts with respect to the denial of its special exception request. (*Id.* at 72–73; Doc. 228 at 7; Doc. 230 at 3).

Ms. McNeil testified that in 2017, she discovered that Clewiston Code section 50 provides that "except in zoning use districts RM-1 and RM-2, no person shall occupy, use or locate a mobile home in any place other than a regularly licensed mobile home park." (Doc. 228-9 at 198). It further states that "no existing mobile home which is located outside of a regularly licensed mobile home park shall be replaced with another mobile home as such time as the present one is removed or damaged beyond repair and/or becomes unsafe." (*Id.*) Finally, the Clewiston Code states that "[o]ccupancy of existing mobile home as permitted by subsection one of this section shall nevertheless be limited to the person in whom legal or equitable title to the real estate on which the mobile home is located." (*Id.*) She states that she sent an email to the City's attorney asking him to review the ordinance and provide his "opinion of its interpretation relative to Clewiston Commons, which is a non-conforming mobile home park." (*Id.* at 202). Ms. McNeil was concerned that she had missed an obvious violation for Clewiston Commons. (*Id.* at 207).

Having determined that, in her opinion, the mobile park's operation itself was a code violation, in October 2017, Ms. McNeil drafted two notices of violation (the "Termination Notices") demanding that Plaintiff cease operating its mobile home park because it conflicted with the commercial zoning designation. (*Id.* at 233; Doc. 228-31). There were now two competing understandings of Plaintiff's property within the City: Mr. Reese believed that the Property was a

legal nonconforming use, such that the mobile home park could remain but not expand via replacement of older trailers; Ms. McNeil believed that the existence of the mobile home park in a property zoned for commercial use was, by definition, a code violation.  (*Compare* Doc. 228-5 at 10 *with* Doc. 228-9 at 198–214).

The Termination Notices issued by Ms. McNeil provided Plaintiff with 180 days from receipt to correct the issues.  (Doc. 228-31 at 2).  But Plaintiff disputed the Termination Notices, which triggered a hearing with the Special Magistrate for Code Enforcement.  (Doc. 24-6 at 2).  The hearing was scheduled for May 16, 2018. (*Id.*)  On May 14, 2018, Plaintiff filed the instant case.  (*See* Doc. 1).

In October 2018, the Special Magistrate held the necessary hearing. (Doc. 228-32).  The Special Magistrate concluded that he lacked jurisdiction to rule on a legal issue such as whether a specific mobile home park is a legal non-conforming use and ordered Plaintiff to remove all mobile homes and cease the use of the subject properties as a mobile home park 180 days from the date of the order, which was October 30, 2018.  (Doc. 228-32 at 2–3).

Plaintiff appealed the Special Magistrate's decision to the Circuit Court in Hendry County.  (*See* Doc. 228-33).  In March 2019, the parties filed a joint stay of the state court case because the matters at issue in the state court case were the same as those in this litigation.  (*Id.*)  And the City agreed to withhold action on the Termination Notices pending resolution of this litigation.  (*Id.* at 2).

The Fourth Amended Complaint, which is the operative complaint here, was filed on September 24, 2019.  (Doc. 111).  Upon Defendant's motion to dismiss (Doc.

8

117), the Court dismissed Count II (the federal due process claim) without prejudice pending the state court case's outcome. (Doc. 145 at 7–8). The parties filed cross-motions for summary judgment in this matter in January 2020. (*See* Docs. 137, 154, 159, 161). The Court disposed of some of the claims via summary judgment but found that the remaining claims would not become ripe until after certain issues were resolved at the state court level. (*See* Doc. 189). Specifically, the Court granted summary judgment to the City on Count I (the equal protection claim) only as to the request for a special exception, and as to the individual Defendants based on qualified immunity. (*Id.* at 3–5). The Court also granted summary judgment as to Count III (Florida state due process) solely as to the building permits and special exception (*Id.* at 6–7). Finally, the Court granted summary judgment as to Count VII. (*Id.* at 10–11).

Shortly thereafter, the parties filed a joint motion requesting a stay of this case pending resolution of the state court case. (Doc. 190 at 1). The Court granted that motion and issued a stay. (Doc. 191).

On May 2, 2022, the Circuit Court of Hendry County rendered its order. (Doc. 198-3 at 3). The Circuit Court found that the City, upon notice to Plaintiff, "had the right, at any point, to withdraw their permission to replace the trailers" and that the City was "within their right to inform [Plaintiff] that they would no longer be permitted to replace decrepit trailers with new trailers." (*Id.* at 4–5). The Circuit Court further stated that no replacement trailers would be allowed because the City has given notice that they have withdrawn their permission to replace the trailers,

that the non-conforming use "must be allowed to continue until the property ceases to be used as a trailer park" and that Plaintiff "is not permitted to extend th[e] life of this nonconforming use by replacing trailers or by taking any other action that would be in violation of city code." (*Id.* at 5–6). Plaintiff indicated that there had been no further appeal of the Special Magistrate's order. (Doc. 198 at 3).

Plaintiff sought rehearing and/or clarification of the May 2, 2022 opinion. (*Id.*; *see also* Doc. 198-4 at 2). The Florida Circuit Court clarified, on July 15, 2022, that its prior ruling "disagree[d] with the Magistrate's conclusion that replacement of old mobile homes with new mobile homes does not extend the non-conforming use." (Doc. 198 at 3; Doc. 198-4 at 3). In other words, the Circuit Court held that while the City cannot ***force*** the removal of usable mobiles homes from Plaintiff's property, replacement of old mobile homes with new mobile homes would ***extend*** the non-conforming use, which is *not* permissible. (Doc. 198-4 at 3).

Plaintiff then filed a Petition for Writ of Certiorari with the Florida Second District Court of Appeal on August 11, 2022. (Doc. 198 at 3). The Petition for Writ of Certiorari was transferred to the newly created Sixth District Court of Appeal in January 2023. (*Id.* at 4). On April 20, 2023, the appellate court denied the Petition for Writ of Certiorari and the mandate was issued on May 11, 2023. (*Id.*) Plaintiff thus represented to this Court that there were no further pending appellate matters requiring resolution and requested a lift of the stay of this matter. (*Id.*) On May 15, 2023, Plaintiff filed a motion to lift the stay in this matter (Doc. 198), which this Court granted on June 21, 2023.

On December 11, 2023, Plaintiff and Defendants filed cross-motions for summary judgment.  (Docs. 227, 228).  These motions are before the Court now for adjudication.

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A material fact is one that "might affect the outcome of the suit under the governing law."  *Id.*  "[A] mere scintilla of evidence" does not create a genuine issue of material fact, so a nonmoving party may not simply state that "the jury might, and legally could, disbelieve the moving party's evidence."  *Hinson v. Bias*, 927 F.3d 1103, 1115–16 (11th Cir. 2019) (citation and internal quotation marks omitted).

Courts may not make credibility determinations or weigh the evidence when reviewing the record.  *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1237 (11th Cir. 2010) ("On summary judgment . . . [n]either [the Eleventh Circuit] nor the district court are to undertake credibility determinations or weigh the evidence.").  Instead, courts view evidence and draw all reasonable inferences in the nonmoving party's favor.  *Rojas v. Florida*, 285 F.3d 1339, 1341–42 (11th Cir. 2002).  But an "inference is not reasonable if it is 'only a guess or a possibility,' for such an inference is not based on the evidence but is pure conjecture and speculation."  *Id.* at 1324.

## DISCUSSION

### I.   Count I: Equal protection under 42 U.S.C. § 1983.

Plaintiff's equal protection claim is a "class of one" claim because it "allege[]s not that [Plaintiff] belongs to a protected class, but that [it] is the only entity being treated differently from all other similarly situated entities." *Chabad Chayil, Inc. v. School Bd. of Miami-Dade Cnty.*, 48 F.4th 1222, 1223 (11th Cir. 2022).[3]  To prevail on this claim, Plaintiff must show that it "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Id.* (quoting *PBT Real Est., LLC v. Town of Palm Beach*, 988 F.3d 1274, 1285 (11th Cir. 2021)).

"[D]ifferent treatment of dissimilarly situated persons does not violate the equal protection clause." *PBT Real Est., LLC*, 988 F.3d at 1285 (quoting *Campbell v. Rainbow City*, 434 F.3d 1306, 1314 (11th Cir. 2006)).  And the Eleventh Circuit

---

[3] In its response to Defendants' motion for summary judgment, Plaintiff changes course and states that this is not a selective enforcement case and thus a similarly situated comparator is not necessary. (Doc. 230 at 8–9).  But the Fourth Amended Complaint is clearly a selective enforcement claim, (*see* Doc. 111 at ¶¶ 81–95). Indeed, Plaintiff's own motion for summary judgment states that "[t]his type of equal protection claim is essentially a selective enforcement claim that, a city's ordinance was applied to one person and not other persons similarly situated" (Doc. 227 at 31).  Plaintiff will not be permitted to suddenly change course in its response to Defendants' summary judgment motion.  *See White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1200 (11th Cir. 2015) ("Despite the liberal pleading standard for civil complaints, plaintiffs may not raise new claims at the summary judgment stage. . . . At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint. . . . A plaintiff may not amend her complaint through argument in a brief opposing summary judgment") (quoting *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1314–15 (11th Cir. 2004) (per curiam) (internal quotation marks omitted).

applies the similarly situated requirement "with rigor." *Chabad Chayil, Inc.*, 48 F.4th at 1223 (quoting *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1207 (11th Cir. 2007)). The entities compared must be "*prima facie* identical in all relevant respects." *Id.* (citing *PBT Real Est., LLC*, 988 F.3d at 1285).

"Too broad a definition of 'similarly situated' could subject nearly all state regulatory decisions to constitutional review in federal court and deny state regulators the critical discretion they need to effectively perform their duties." *Griffin Indus., Inc.*, 496 F.3d at 1203. "Conversely, too narrow a definition of 'similarly situated' could exclude from the zone of equal protection those who are plainly treated disparately and without a rational basis." *Id.* Thus, "[a] plaintiff must ultimately show that it and any comparators are similarly situated in light of all the factors that would be relevant to an objectively reasonable governmental decisionmaker." *Chabad Chayil, Inc.*, 48 F.4th at 1223 (internal quotation marks omitted) (quoting *Douglas Asphalt Co. v. Qore, Inc.*, 541 F.3d 1269, 1275 (11th Cir. 2008)). In evaluating this requirement, courts consider the state action "in light of the full variety of factors that an objectively reasonable governmental decisionmaker would have found relevant in making the challenged action." *Burns v. Town of Palm Beach*, 999 F.3d 1317, 1352 (11th Cir. 2021) (quoting *Campbell*, 434 F.3d at 1314).

The Court previously found that defendants Gardner, Perry, Reese, and McNeil are entitled to qualified immunity as to this claim. (Doc. 189 at 5). The Court also rejected Plaintiff's contention that similarly situated comparators were

granted special exceptions to the zoning law.  First, the alleged comparator, Clewiston Marina, was a zoned high-density residential, while Plaintiff is zoned commercial.  (*Id.* at 4).  Second, even if Plaintiff could meet its burden of alleging a similarly situated comparator, the City provided legitimate government purposes to plausibly explain its actions, such as reducing blight and creating a cohesive neighborhood.  (*Id.*)  The Court reserved its decision on all other aspects of this claim because they were not yet ripe due to the pending state court action. (*Id.* at 3–4).  As a threshold matter, the Court finds that all issues within this claim are now ripe here because all appeals of this matter in state court have been resolved.  (Doc. 198 at 3–4).

Plaintiff and the City cross-move for summary judgment as to this claim. Plaintiff argues that the Court should grant it summary judgment because "the City has acted intentionally, arbitrarily, and maliciously in attempting to prevent Plaintiff from the lawful use of the Property and denying Plaintiff equal protection of the law afforded to all other similarly situated property owners in the City" (Doc. 227 at 30–39), while Defendant argues that Plaintiff has not identified a valid comparator and that the City's actions are supported by a legitimate government interest (Doc. 228 at 14–19).

The Court begins its analysis by deciding whether Plaintiff has identified any similarly situated comparators.  Plaintiff identifies several properties that it maintains are similarly situated comparators that "have been identified by the City as those who have been allowed to continue their non-conforming use and unlike

14

Plaintiff, have not been issued Notices of Violation to cease operation." (Doc. 227 at 21). For example, Roland Martin Lake Side RV Park, Roland Martin RV Park, and Aztec Mobile Home Park are properties zoned either R-3 (multiple-family residential district) or Industrial but permitted to be used as mobile home and/or RV park (the "Mobile Home Park Comparators"). (*Id.* at 20–21). Four other properties identified by Plaintiff are zoned either Commercial or Residential but permitted to be used as Single Family Residential or Agricultural (the "Other Comparators"). (*Id.* at 21).

Defendants argue that the Mobile Home Park Comparators are not similarly situated because none of them are zoned Commercial like Plaintiff. (Doc. 229 at 11). The Court agrees. The Mobile Home Park Comparators are located in different zones from Plaintiff, which serve different zoning interests from Plaintiff's zone, and thus are not "similarly situated" to Plaintiff in all relevant respects. *See Fla. Teepee, LLC v. Walton Cnty., Fla.*, Case No. 3:22cv20588-TKW-ZCB, 2022 WL 19573772, at *2 (N.D. Fla. Dec. 16, 2022) (concluding that "the comparator properties that were allegedly treated differently than Plaintiffs' property are in different zoning categories—and, thus, not similarly situated 'in all relevant respects'"); *Sephardi v. Town of Surfside*, No. 99-1566-CIV, 2003 WL 25728156, at *1 (S.D. Fla. Jan. 6, 2003) ("The fact that the [properties] are located in different zones, which serve different zoning interests, prevents them from being considered to be 'similarly situated' for purposes of determining whether [defendant's] enforcement of its zoning laws was discriminatory. The Court can envision

circumstances in which the type of zone in which an entity is located could dictate whether a city would choose to allow a nonconforming use").  Indeed, in the previous summary judgment order in this matter, the Court found that Clewiston Marina, Inc. was not a similarly situated comparator, in part because Clewiston Marina was zoned high-density residential, while Clewiston Commons was zoned commercial. (Doc. 189 at 4).

The Other Comparators are also not adequately similarly situated to Plaintiff.[4]  Three of the Other Comparators are zoned Commercial but permitted for use as Single Family Residential.  (Doc. 227 at 21).  While the Property is also zoned Commercial, the Property and these potential comparators are being used for different non-conforming purposes; thus, they are not similarly situated comparators.  *See Campbell*, 434 F.3d at 1314–15 ("In any type of zoning situation, the use of the proposed development is quite relevant. . . . Because the [plaintiffs] sought to build a large residential complex, it would be in error for the court to consider commercial developments that sought tentative approval to be considered similarly situated.").  The last of the Other Comparators is zoned Residential but permitted to be used as Agricultural.  (Doc. 227 at 21).  Plainly, for the same reasons as the Mobile Home Park Comparators and the rest of the Other Comparators, that alleged comparator is not similarly situated to Plaintiff.

---

[4] There is a dispute over whether the evidence of Other Comparators is admissible. (Doc. 229 at 8–10; Doc. 231 at 2–3).  Because the Court finds that the Other Comparators are not similarly situated comparators, it need not address this dispute.

Plaintiff points to two out-of-circuit cases, seemingly in support of its argument that the comparators are similarly situated.  (Doc. 227 at 33–34).  Although these cases are not mandatory authority for this Court, the Court has considered them in its analysis and found that they are not persuasive on the issues in this matter.

In *Eternal Investments, LLC v. City of Lee's Summit*, No. 05-0521-CV-W-FJG, 2007 WL 679883 (W.D. Mo. 2007), a court granted summary judgment to a developer on its equal protection claim where, according to Plaintiff's summary, plaintiff "presented evidence that every other developer that applied to rezone property in the preceding 10 years had been successful and that their properties had similar characteristics to the plaintiff's tracts of land."  (Doc. 227 at 33).  But in that case, the plaintiff stated that "every other applicant who sought rezoning ***from AG to R-1***, got their property rezoned as requested," except plaintiff.  *Eternal Investments, LLC*, 2007 WL 679883, at *4 (emphasis added).  Here, Plaintiff has provided no comparator that is both zoned Commercial and is being used as a mobile home or RV park.  Unlike here, the plaintiff in *Eternal Investments* further provided details about how certain tracts of land were nearly identical to its tract of land.  *Id.*  No such evidence has been presented here.

In *Fortress Bible Church v. Feiner*, 694 F.3d 208 (2d Cir. 2012), the Second Circuit found that where "the issues compared are *discrete* and not cumulative or affected by the *character of the project as a whole*, multiple comparators are sufficient so long as the issues being compared are so similar that differential

treatment with regard to them cannot be explained by anything other than discrimination."  694 F.3d at 222–23 (emphasis added).  In that case, a church's application was denied purportedly because of "a recently enacted 'steep slope' zoning ordinance, stress on the police and fire departments, retaining walls that constituted an attractive nuisance, and traffic and parking problems."  *Id.* at 223. In other words, the application in that case was denied for discrete issues that did not spur denials in other applications containing similar discrete issues.  *Id.*  The character of the project as a whole was not at issue.  *Id.*  Here, however, the issuance of the Termination Notices, the denial of a special exception, and the denial of replacement permits all occurred because Plaintiff was operating a mobile home and RV park in a property zoned Commercial, which this Court finds is an issue affected by the character of the project as a whole.  Thus, similarly situated comparators would also have to be operators of mobile homes in commercial zones. Accordingly, the analysis in *Fortress Bible Church* is not helpful to Plaintiff here.

Because the "similarly situated" requirement must be enforced with rigor, the Court finds that neither the Mobile Home Park Comparators nor the Other Comparators is similarly situated to Plaintiff.  *See Chabad Chayil, Inc.*, 48 F.4th at 1223 ("We apply the similarly situated requirement with rigor") (internal quotation marks and citations omitted); *see also Cordi-Allen v. Conlon*, 494 F.3d 245, 251 (1st Cir. 2007) ("The 'similarly situated' requirement must be enforced with particular rigor in the land-use context because zoning decisions 'will often, perhaps almost always, treat one landowner differently from another") (quoting *Vill. Of*

*Willowbrook v. Olech*, 528 U.S. 562, 565 (2000) (Breyer, J., concurring); *Lindquist v. City of Pasadena, Tex.*, 656 F. Supp. 2d 662, 688 (S.D. Tex. 2009) (high showing of similarity required because "unless carefully circumscribed, the concept of a class-of-one equal protection claim could effectively provide a federal cause of action for review of almost every executive and administrative decision made by state actors") (quoting *Jennings v. City of Stillwater*, 383 F.3d 1199, 1210 (10th Cir. 2004)).

Because no reasonable jury could find that a similarly situated comparator exists in this matter, the Court need not address whether there was a rational basis for the City's treatment of Plaintiff.  The Court notes, however, that it previously determined that "[e]ven if Clewiston Commons could meet its burden of alleging a similarly situated comparator, the City provides legitimate government purposes to plausibly explain its actions, such as reducing blight and creating a cohesive neighborhood."  (Doc. 189 at 4 (citing *Corn v. City of Lauderdale Lakes*, 997 F.2d 1369, 1387 (11th Cir. 1993)).  Because no reasonable jury could find that Plaintiff identified a similarly situated comparator, the Court grants summary judgment to the City as to the equal protection claim.

## II.    Count II: The federal due process claim.

Count II was dismissed without prejudice pending the outcome of the state court case.  (Doc. 145 at 7–8).  Plaintiff has not pursued reinstatement of this claim. Accordingly, the Court finds that Plaintiff has abandoned this claim.

19

### III.    Count III: State law procedural due process claim.

The Florida Constitution's due process clause provides, "[n]o person shall be deprived of life, liberty or property without due process of law."  Fla. Const. art. I, § 9.  "Procedural due process imposes constraints on governmental decisions that deprive individuals of liberty or property interests."  *Massey v. Charlotte Cnty.*, 842 So. 2d 142, 146 (Fla. 2d DCA 2003).  It "serves as a vehicle to ensure fair treatment through the proper administration of justice where substantive rights are at issue."  *Dep't of Law Enforcement v. Real Prop.*, 588 So. 2d 957, 960 (Fla. 1991).  Procedural due process "requires both fair notice and a real opportunity to be heard."  *Keys Citizens for Responsible Gov't, Inc. v. Fla. Keys Aqueduct Auth.*, 795 So. 2d 940, 948 (Fla. 2001).  The notice must convey the requisite information to the parties affected and it must afford the parties an appropriate amount of time to make their appearance.  *Id.*  "The specific parameters of the notice and opportunity to be heard required by procedural due process are not evaluated by fixed rules of law, but rather by the requirements of the particular proceeding."  *Id.* (citing *Gilbert v. Homar*, 520 U.S. 924 (1997)).  "Due process is flexible and calls for such procedural protections as the particular situation demands."  *Schimenti v. School Bd. of Hernando Cnty.*, 73 So. 3d 831, 833 (Fla. 5th DCA 2011).  Defendant moves for summary judgment on this count, but Plaintiff does not.  (Doc. 228 at 19–21).

Plaintiff's state law procedural due process claim consists of several components, but the Court's previous order granted summary judgment to the City as to the entirety of the claim other than as to the Termination Notices.  (Doc. 189

20

at 5–7).  Accordingly, the Court now considers whether the City failed to provide due process because Plaintiff did not have an adequate opportunity to be heard before the Termination Notices were issued and whether the fact that the Termination Notices lacked information about Plaintiff's opportunity to object constitutes a failure to provide due process.

First, it does not appear that Plaintiff was ever actually deprived of liberty or property because of the Termination Notices.  Plaintiff admits that the City agreed not to take any action to enforce the Termination Notices while the state court action was pending.  (Doc. 228-33 at ¶ 5; Doc. 228 at ¶ 41; Doc. 230 at ¶ 41).  And the state court ultimately ruled that "the City of Clewiston cannot force the removal of all usable mobile homes from Clewiston Commons property." (Doc. 227-23 at 2).  Accordingly, there is no record evidence that any deprivation of liberty or property occurred.  Thus, Plaintiff's claim must fail as a matter of law. *See* Fla. Const. art. I, § 9. *See Cleveland Bd. of Educ. v. Loudermill* 470 U.S. 532, 542 (1985) (due process requires "that a *deprivation of life, liberty, or property* be preceded by notice and opportunity for hearing appropriate to the nature of the case") (emphasis added) (quotation marks omitted).  Plaintiff insists that it should have been given an opportunity to challenge the Termination Notices before they were issued, but even if Plaintiff was deprived of some liberty or property at some point, there is certainly no evidence in the record that the Termination Notices **themselves** deprived Plaintiff of any liberty or property and Plaintiff has provided no case law or non-conclusory argument supporting otherwise.

21

Even if the Termination Notices had eventually deprived Plaintiff of liberty or property, Plaintiff "was afforded, and actually utilized, full judicial procedures to challenge" the City's decisions.  *See City of Pompano Beach v. Yardarm Restaurant, Inc.*, 934 So. 2d 861, 866 (Fla. 4th DCA 2002) (citing *Boatman v. Town of Oakland*, 76 F.3d 341 (11th Cir. 1996) (holding that property owners' civil rights action against a town for its refusal to issue them a certificate of occupancy did not fall under the procedural component of § 1983 because the state provided them all the process they were due, i.e., the right to repair to the circuit court and seek an order compelling a final inspection)).[5]

It is undisputed that Plaintiff had a hearing with the Special Magistrate for Code Enforcement.  (Doc. 24-6 at 2).  After this Court granted summary judgment in part and found that the remainder of the claims were not ripe until after certain issues were resolved at the state court level (Doc. 189), the parties stayed this matter and went through the state court process.  (*See* Doc. 190).

---

[5] There are significant similarities between the due process clauses of the United States and Florida Constitutions, making analyses of claims arising from each substantially similar to the other. *See Persaud Properties FL Investments, LLC v. Town of Fort Myers Beach, Florida*, 658 F. Supp. 3d 1072, 1079 (M.D. Fla. 2023), *appeal dismissed*, 23-10881-DD, 2023 WL 6141293 (11th Cir. Aug. 14, 2023); *DuPont Hollywood Ltd. v. City of Hollywood, Fla.*, Case No: 06-60697-CIV-MORENO, 2006 WL 8432519, at * 2 (S.D. Fla. Oct. 17, 2006) (noting that the facts, burdens of proof, and analysis with respect to the due process clauses of the United States Constitution and the Florida Constitution are substantially similar) (citation omitted)); *cf. Dep't of Law Enforcement v. Real Prop.*, 588 So. 2d 957, 960 (Fla. 1991) (explaining that under both the Florida Constitution and the United States Constitution, "procedural due process serves as a vehicle to ensure fair treatment through the proper administration of justice where substantive rights are at issue").

First, the Circuit Court found that the Special Magistrate improperly concluded that he could not make a determination of the law as to Clewiston Commons' legal nonconforming use. (Doc. 227-20 at 1–2). The Special Magistrate then spent two days reviewing exhibits and hearing testimony, after which the Special Magistrate found, in relevant part, that the continued mobile home park use is permissible as a legal non-conforming use. (Doc. 227-21 at 1–9). The Circuit Court affirmed as to that part of the Special Magistrate's order. (Doc. 227-22 at 5). The Circuit Court then reiterated, in a final order, that Plaintiff's non-conforming use "must be allowed to continue until the property ceases to be used as a trailer park." (Doc. 227-23 at 1–2). Given this procedural history demonstrating both the requisite notice and opportunity to be heard components of procedural due process no reasonable jury could find that Plaintiff was deprived of procedural due process. Furthermore, Plaintiff provides no case law supporting its theory that the due process it received took too long. (Doc. 230 at 11).

In sum, the Court finds that no deprivation of property ever occurred. Moreover, Plaintiff plainly had the opportunity to challenge the Termination Notices before any potential deprivation could occur and it successfully did so. Accordingly, the Court grants summary judgment to Defendant on this count.

## IV.    Count IV: Inverse condemnation/takings claim.

"Inverse condemnation is a cause of action by a property owner to recover the value of property that has been *de facto* taken by an agency having the power of eminent domain where no formal exercise of that power has been undertaken."

23

*Osceola Cnty. v. Best Diversified, Inc.*, 936 So. 2d 55, 59–60 (Fla. 5th DCA 2006) (citations omitted).  Plaintiff's inverse condemnation claim arises under both the Fifth Amendment of the United States Constitution and under Article X of the Florida Constitution.  (Doc. 111 at ¶ 110).

Under Article X, Section 6(a) of the Florida Constitution, "[n]o private property shall be taken except for a public purpose and with full compensation therefor paid to each owner[.]"  To plead a sufficient takings claim under the Florida Constitution, a plaintiff must allege that the government either (1) required him to submit to a temporary or permanent physical occupation of his land or (2) enacted a regulation or imposed a condition that deprived him of all economically beneficial use of his land.  *Fla. Fish & Wildlife Conservation Comm'n v. Daws*, 256 So. 3d 907, 914 (Fla. 1st DCA 2018).  The Takings Clause of the Fifth Amendment provides that property shall not "be taken for public use, without just compensation."  U.S. Const. amend. V.  Courts within the Eleventh Circuit "analyze claims under the [Fifth Amendment's] Takings Clause and Article 10, Section 6 of the Florida Constitution under the same legal standard."  *Megladon, Inc. v. Vill. of Pinecrest*, 661 F. Supp. 3d 1214, 1239 n.16 (S.D. Fla. 2023) (citation omitted); *see also Chmielewski v. City of St. Pete Beach*, 890 F.3d 942, 949 (11th Cir. 2018) ("Because Florida follows federal takings law, we can look to cases brought under the Fifth Amendment to inform our analysis.").

Takings may be categorical or regulatory.  *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 322–23 (2002).  Categorical takings occur

when the government "physically takes possession for an interest in property for some public purpose" and thus has a "categorical duty to compensate the former owner." *Id.* (citation omitted). Regulatory takings, on the other hand, stem from government regulation that "goes too far" and thus are recognized as takings. *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537–38 (2005). Regulatory takings require "essentially ad hoc, factual inquiries . . . designed to allow careful examination and weighing of all the relevant circumstances." *Tahoe-Sierra Pres. Council, Inc.*, 535 U.S. 302, 322 (2002) (quotation marks and citation omitted). The distinction is between acquisitions of property for public use (a categorical taking) and regulations prohibiting private uses (a regulatory taking). *Id.* at 323–24. Importantly, "[l]and-use regulations are ubiquitous and most of them impact property values in some tangential way—often in completely unanticipated ways." *Id.* at 324. And "[t]reating them all as *per se* takings would transform government regulation into a luxury few governments could afford." *Id.*

A regulation which completely deprives an owner of "*all* economically beneficial us[e]" of his property, however, will constitute a *per se* taking under the Fifth Amendment. *Lucas v. S. Carolina Coastal Council*, 505 U.S. 1003, 1019 (1992) (emphasis in original). "[T]he government must pay just compensation for such 'total regulatory takings,' except to the extent that 'background principles of nuisance and property law' independently restrict the owner's intended use of the property." *Lingle*, 544 U.S. at 538 (citing *Lucas*, 505 U.S. at 1026–32).

25

Plaintiff and the City have each moved for summary judgment on this count. (Doc. 227 at 41–43; Doc. 228 at 21–30). Plaintiff argues that the City's actions with respect to the Property, including the City's denial of Plaintiff's permits, enforcement of corrective actions, denial of the Special Exception application and issuance of the Termination Notices have had and continue to have a detrimental economic effect on Plaintiff and unreasonably interfere with Plaintiff's reasonable use of the Property. (Doc. 227 at 41; Doc. 111 at ¶¶ 110, 115). Defendant agrees that Plaintiff possesses a cognizable Fifth Amendment property interest in the continued use of its land as a trailer park but argues that Plaintiff had no cognizable property interest related to the special exception and building permits and because the Termination Notices never went into effect. (Doc. 228 at 22–30).

Although Plaintiff summarily states that "each and all [of the City's actions] deprive Plaintiff of all or substantially all economic, beneficial use of the Property," Plaintiff has not proffered any evidence of deprivation of **_all_** economic, beneficial use of the Property. (*See* Doc. 227 at 41). For example, Mr. Khan testified that Plaintiff has "suffered loss of income" and "loss of ability to raise [it]s rents because [it] can't move anybody out." (Doc. 227-3 at 83). But that does not amount to a deprivation of *all* economically beneficial use. *See Lingle*, 544 U.S. at 539 ("In the *Lucas* context, . . . the complete elimination of a property's value is the determinative factor"); *Lucas*, 505 U.S. at 1019 n.8 ("[I]n at least *some* cases the landowner with 95% loss will get nothing, while the landowner with total loss will recover in full. . . . Takings law is full of these 'all-or-nothing' situations."). Indeed,

the Supreme Court has found that "mere diminution in the value of property, however serious, is insufficient to demonstrate a taking." *Concrete Pipe and Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 645 (1993).

Because the Court has determined that Plaintiff has not been deprived of *all* economically beneficial use of the Property, the Court will engage in an ad hoc, factual inquiry to determine whether a taking took place. *See Tahoe-Sierra Pres. Council, Inc.*, 535 U.S. at 322. "In deciding whether a particular governmental action has effected a taking, [courts] focus[] both on the character of the action and on the nature and extent of the interference with rights in the parcel as a whole . . . ." *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 130–31 (1978). There is "no magic formula enabl[ing] a court to judge, in every case, whether a given government interference with property is a taking. In view of the nearly infinite variety of ways in which government actions or regulations can affect property interests, the Court has recognized few invariable rules in this area." *Arkansas Game & Fish Comm'n v. United States*, 568 U.S. 23, 31 (2012).

The Supreme Court has identified several factors that have particular significance in the Court's inquiry. *See Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978). "The economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations are . . . relevant considerations." *Id.* (citation omitted). "So, too, is the character of the governmental action. A 'taking' may more readily be found when the interference with property can be characterized as a

physical invasion by government . . . than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Id.*

In applying the *Penn Central* factors, the Eleventh Circuit has advised that, "[a] reduction in value alone will not constitute a taking." *Dirt, Inc. v. Mobile Cnty. Comm'n*, 739 F.2d 1562, 1566 (11th Cir. 1984). "[A]n otherwise valid exercise of the police power is not a taking simply because the regulation deprives the owner of the most beneficial use of his or her property." *Rymer v. Douglas Cnty.*, 764 F.2d 796, 801 (11th Cir. 1985). The "*Penn Central* inquiry turns in large part, albeit not exclusively, upon the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests." *Lingle*, 544 U.S. at 539–40. Even if Plaintiff is correct that the City's actions have made the use of the Property as an income-producing mobile home park less fruitful or more difficult, there is simply no evidence in the record that the City's actions have created a reduction in value of the Property itself.

Perhaps anticipating this result, Plaintiff states for the first time in its response to Defendants' motion for summary judgment that "there are questions of material fact regarding the impact of the City's actions on Plaintiff's use expectations and therefore, summary judgment cannot be entered in Defendants' favor." (Doc. 230 at 15). But discovery in this matter has closed and Plaintiff points to no evidence whatsoever of the economic impact on the Property other than Mr. Khan's testimony that Plaintiff has "suffered loss of income, loss of ability to raise

[the] rents because [they] can't move anybody out." (Doc. 227-3 at 83). As such, Plaintiff has failed to submit competent evidence to show that there has been economic impact on the Property that would rise to the level of a taking. *See Samuel v. Granite Servs. Int'l, Inc.*, No. 8:15-CV-2072-T-33TGW, 2016 WL 11493322, at *9 (M.D. Fla. Nov. 23, 2016) ("[I]t is the party opposing summary judgment, and not the Court, that bears the burden of perusing the record to find evidence creating genuine issues of material fact") (citation omitted); *Lusco v. Univ. Realty of Tampa*, No. 8:13-cv-420-T-33EAJ, 2014 WL 1152934, at *6 (M.D. Fla. Mar. 21, 2014) ("It is the obligation of the non-moving party . . . not the court, to scour the record in search of the evidence that would defeat a motion for summary judgment.").

Because Plaintiff has pointed to no record evidence of the economic impact on the Property and has not identified any specific investment-backed expectation that the City's actions have stymied, the Court grants summary judgment to the City on this count.[6]

---

[6] The City's initial motion argues that Plaintiff's inverse condemnation count fails because Plaintiff does not have a cognizable interest in the building permits and the special exception. (Doc. 228 at 24–28). Whether or not true, these arguments miss the point because Plaintiff is clearly complaining about an alleged loss of a particular use of the Property, rather than its loss of permissions that would allow it to keep the Property. (Doc. 111 at ¶¶ 109–20). In its reply, however, rather than further opining on these arguments, Defendant argues that "Plaintiff has still adduced no evidence to establish any fiscal impact on its property." (Doc. 232 at 5).

## V.      Count V: Declaratory relief.

As a threshold matter, although the Fourth Amended Complaint indicates that this count is brought under Florida state law, "[d]eclaratory judgment acts are procedural in nature and, thus under the Erie doctrine, this Court must apply federal procedural law." *Krauser v. BioHorizons, Inc.*, 903 F. Supp. 2d 1337, 1346 n.6 (S.D. Fla. 2012) (citations omitted); *see also Manuel v. Convergys Corp.*, 430 F.3d 1132, 1138 n.3 (11th Cir. 2005) ("There is little doubt, and the parties do not argue otherwise, that the district court had to apply the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, rather than the state declaratory judgment act, in this action"); *Goodbys Creek, LLC v. Arch Ins. Co.*, Case No. 3:07-cv-947-J-34HTS, 2009 WL 10671130, at *3 (M.D. Fla. Aug. 11, 2009) ("[T]he Court's discretion with respect to declaratory relief is specifically derived from the federal Declaratory Judgment Act, which the Eleventh Circuit has held to be procedural in nature. . . . Accordingly, the Court determines that although [the claim] seeks declaratory relief pursuant to both the Florida and federal Declaratory Judgment Acts, the federal Declaratory Judgment Act governs any procedural matters.").

The federal Declaratory Judgment Act authorizes a federal court, "in a case of actual controversy within its jurisdiction . . . [to] declare the rights and other legal relations of any interest party seeking such declaration[.]" 28 U.S.C. § 2201.  The Declaratory Judgment Act requires that there must be an "actual controversy" before a court considers granting declaratory relief.  *Med Immune Inc. v. Genentech, Inc.*, 549 U.S. 118, 126 (2007).  "Basically, the question in each case is whether the

facts alleged, under all circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id.* at 127. "Ordinarily, a controversy is not sufficiently immediate or real where the parties' dispute . . . has been rendered moot . . . ." *Mt. Hawley Ins. Co. v. Tactic Security Enforcement, Inc.*, 252 F. Supp. 3d 1307, 1309 (M.D. Fla. 2017) (citing *Texas v. United States*, 523 U.S. 296, 300 (1998)).

Here, Plaintiff's request for a declaratory judgment indicates five specific declarations that Plaintiff wishes the Court to make. (Doc. 111 at ¶¶ 121–39). All five of the requested declarations were denied on the merits for the reasons explained in this order, where the Court granted the Defendants' motions for summary judgment as to each of them. That is, there is nothing left for the Court to declare because the declarations sought are either moot or the underlying claim underpinning the requested declarations has been adjudicated. Even more, Plaintiff fails to point the Court to any legal support to justify such declarations.

In all events, for completeness, Plaintiff seeks an order declaring the use of the Property as a mobile home park is a continued, legal non-conforming use. (*Id.* at 32). This issue is moot because the state court has already determined that the mobile home park is a legal non-conforming use. (Doc. 227-21 at 6; Doc. 227-22 at 2). *See Mt. Hawley Ins. Co.*, 252 F. Supp. 3d at 1309 (citing *Texas*, 523 U.S. at 300).

Second, Plaintiff seeks an order declaring the Corrective Actions inconsistent with the City's zoning regulation powers and the City's Code of Ordinances

31

unconstitutional.  (Doc. 111 at 32).  Plaintiff does not provide support for this request.  (Doc. 227 at 39–41); *see also* §§ I, III, IV.

Third, Plaintiff requests that the Court declare that the City's denial of Clewiston Commons' Special Exception Application is inconsistent with the legal non-conforming use allowed in the City and in the State of Florida.  (Doc. 111 at 32).  Again, Plaintiff does not provide support for this request.  (*See* § I).

Fourth, Plaintiff seeks an order declaring the Termination Notices "*void ab initio*" as they fail to include times of any hearings before the Special Magistrate if the violations were not corrected and did not provide a procedure or mechanism through with Clewiston Commons could dispute or contest the violations before a Special Magistrate and/or Circuit Court."  (Doc. 111 at 32); *see Mt. Hawley Ins. Co.*, 252 F. Supp. 3d at 1309 (citing *Texas*, 523 U.S. at 300).  The issue of the Termination Notices is moot because the Circuit Court essentially found that they cannot be effectuated.  (*See* Doc. 227-23 at 1–2 ("Plaintiff's non-conforming use of the Property "must be allowed to continue until the [P]roperty ceases to be used as a trailer park.")).

Finally, Plaintiff requests an award of all attorney's fees, costs, and expenses incurred by Plaintiff in the prosecution of this action.  But Plaintiff has not provided any basis on which the Court should grant it attorneys' fees.

Thus, Plaintiff's motion for summary judgment is denied as to this count.  And the Court dismisses Count V as a matter of law.  First, the Court has granted summary judgment to Defendants on the claims underpinning the declarations

sought by Plaintiff here.  Alternatively, it is not this Court's responsibility to mine the record to find evidence that could support Plaintiff's declaratory claim.  *See Samuel*, 2016 WL 11493322, at *9 ("[I]t is the party opposing summary judgment, and not the Court, that bears the burden of perusing the record to find evidence creating genuine issues of material fact") (citation omitted); *Lusco*, 2014 WL 1152934, at *6 ("It is the obligation of the non-moving party . . . not the court, to scour the record in search of the evidence that would defeat a motion for summary judgment.").  But that's what the Plaintiff has left the Court to do here.

## VI.    Count VI: Tortious interference.

Under Florida law, the elements of tortious interference with a business relationship are: (1) the existence of a business relationship that affords the plaintiff existing or prospective legal rights; (2) the defendant's knowledge of the business relationship; (3) the defendant's intentional and unjustified interference with the relationship; and (4) damage to the plaintiff.  *See Int'l Sales & Servs., Inc. v. Austral Insulated Prods., Inc.*, 262 F.3d 1152, 1154 (11th Cir. 2001) (citing *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814 (Fla. 1994)).  "Causation requires a plaintiff to prove that the defendant manifested a specific intent to interfere with the business relationship.  No liability will attach unless it is established that the defendant intended to procure a breach."  *Mortgage Now, Inc. v. Guaranteed Home Mortg. Co., Inc.*, 545 Fed. App'x 809, 811 (11th Cir. 2013) (quoting *Fiberglass Coatings, Inc. v. Interstate Chem., Inc.*, 16 So. 3d 836, 838 (Fla. 2d DCA 2009)).

Plaintiff moves for summary judgment, claiming that the City and the individual defendants tortiously interfered with Plaintiff's business relationships, including with the tenants of the mobile home park, as well as with "various contractors, consultants, and vendors that Clewiston Commons did business with for the use and management of the [P]roperty." (Doc. 227 at 44). Defendants admit that the first element of tortious interference is not at issue but argue that Plaintiff cannot prove the remaining elements. (Doc. 228 at 30–33; Doc. 229 at 18).

The Court denies both motions for summary judgment on this claim. As an initial matter, Defendants' argument that all of their actions were within their police power is conclusory. Moreover, while a reasonable jury could find that Defendants' actions were within their police power, the Court finds that a reasonable jury could also find that at least some of their actions were not.

Defendants admit that the first element of tortious interference is not at issue. (Doc. 229 at 18). With respect to the remaining elements, there is sufficient record evidence that Defendants[7] knew about the existing business relationships and wished to interfere with Plaintiff's leases (*see e.g.*, Doc. 227-8 at 1) such that a reasonable jury could find that they interfered without justification, at least with respect to the Termination Notices. A reasonable jury could infer this intent because, as the state court found, Plaintiff's use of the Property was a legal non-

---

[7] The Court refers to "Defendants" because Count VI was brought against Defendants City, Gardner, Perry, Reese, and McNeil. Defendants did not argue that the claim should, in the alternative, be dismissed as to only certain of Defendants; thus the claim remains against all of them.

conforming use that "must be allowed to continue until the [P]roperty ceases to be used as a trailer park." (S*ee* Doc. 228-23 at 8; Doc. 227-22).

The Court notes that whether to grant Defendant's motion for summary judgment on this count was a close call for two reasons, each of which present serious issues with Plaintiff's tortious interference claim.

First, despite the many allegations of general ill will in the fact section of Plaintiff's argument, Plaintiff failed to point to any record evidence to demonstrate any *specific business relationships that* Defendants knew of and knowingly interfered with. *See Abusaid v. Hillsborough Cnty. Bd. of Cnty. Com'rs*, 637 F. Supp. 2d 1002, 1027 (M.D. Fla. 2007) ("Florida law does not recognize an action for interfere with a business's relationship to past customers or the community at large."). Second, although the record contains some general, broad stroke evidence of damages (Doc. 227-3 at 83–84), the record is scant with evidence as to damages. Plaintiff will have to show that the damages are specifically connected to any interference that *was unjustified* as opposed to interference that *was justified*. Ultimately, the Court finds that a reasonable jury could find that Defendants knew about and unjustifiably interfered with Plaintiff's business relationships, particularly with respect to Plaintiff's tenants and that Plaintiff suffered damages as a result. (Doc. 228 at 30–32).

## CONCLUSION

For the reasons set forth above, it is **ORDERED**:

1. Plaintiff's Motion for Summary Judgment (Doc. 227) is **DENIED**.

2. Defendants' Motion for Summary Judgment (Doc. 228) is **GRANTED in part and DENIED in part**.

**3.** The only remaining count in this matter is Count VI, the tortious interference with business relationships claim.  Should the parties wish to file renewed motions for summary judgment on this count, they may file a request for leave to do so.

4. Independently, this Court appreciates the complexity of this case and the frustration of the parties.  The Court is mindful that the parties have each incurred litigation costs and that an appeal of this Court's order may further increase those litigation costs.  To attempt to defray additional costs, the Court will offer the parties a settlement conference to be conducted by a United States Magistrate Judge at no additional costs to them.  The Court asks that, should the parties request such, that they do so after meaningfully conferring with each other that a settlement is reasonable given the parties' positions.  Should the parties wish to request a settlement conference conducted by a United States Magistrate Judge, they shall file a joint notice stating same no later than May 3, 2024.  Otherwise, the Court will notice a status hearing to discuss scheduling trial.

5.  The Clerk of Court is **DIRECTED** to terminate Defendant Kathy Combass

because there are no claims remaining against her.

**ORDERED** at Fort Myers, Florida on April 23, 2024.

JOHN L. BADALAMENTI
UNITED STATES DISTRICT JUDGE

37